Blake v. Garland

BIA
Reid, IJ
A086 979 655

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

# <u>SUMMARY ORDER</u>

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 5th day of June, two thousand twenty-three.

PRESENT:
> GUIDO CALABRESI,
> SUSAN L. CARNEY,
> JOSEPH F. BIANCO,
> *Circuit Judges.*

_____

ANTHONY ROHAN O'NEIL BLAKE,
> *Petitioner,*

v.                                                                          22-6338
                                                                            NAC

MERRICK B. GARLAND, UNITED STATES ATTORNEY GENERAL,
> *Respondent.*

_____

FOR PETITIONER:              Thomas H. Nooter, Freeman, Nooter & Ginsberg, New York, NY.

**FOR RESPONDENT:**    Brian M. Boynton, Principal Deputy Assistant Attorney General; Shelley R. Goad, Assistant Director; Jennifer A. Singer, Trial Attorney, Office of Immigration Litigation, United States Department of Justice, Washington, DC.

UPON DUE CONSIDERATION of this petition for review of a Board of Immigration Appeals ("BIA") decision, it is hereby ORDERED, ADJUDGED, AND DECREED that the petition for review is GRANTED.

Petitioner Anthony Rohan O'Neil Blake, a native and citizen of Jamaica, seeks review of a July 1, 2022 decision of the BIA affirming a January 20, 2022 decision of an Immigration Judge ("IJ") denying his application for deferral of removal under the Convention Against Torture ("CAT"). *In re Anthony Rohan O'Neil Blake,* No. A 086 979 655 (B.I.A. Jul. 1, 2022), *aff'g* No. A 086 979 655 (Immig. Ct. N.Y. City Jan. 20, 2022). We assume the parties' familiarity with the underlying facts and procedural history.

We have reviewed both the IJ's and the BIA's opinions "for the sake of completeness." *Wangchuck v. Dep't of Homeland Sec.*, 448 F.3d 524, 528 (2d Cir. 2006). "[W]e apply the substantial evidence standard to questions of fact raised in [Blake's] . . . CAT challenge[ ], and *de novo* review to all questions of law, including the application of law to facts." *Quintanilla-Mejia v. Garland*, 3 F.4th

2

569, 583 (2d Cir. 2021); *see also Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020).[1]

Under the substantial evidence standard, "we must uphold agency factfinding 'unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Quintanilla-Mejia*, 3 F.4th at 583 (emphasis omitted) (quoting 8 U.S.C. § 1252(b)(4)(B)).

An applicant for CAT relief bears the burden of "establish[ing] that it is more likely than not that he . . . would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2); *see also id.* § 1208.17(a) (setting forth standards under which deferral of removal under CAT "shall be granted"). "To qualify as torture, actions must be 'inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.'" *Nasrallah*, 140 S. Ct. at 1688 n.1 (quoting 8 C.F.R. § 1208.18(a)(1) (2019)). "Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity."

---

[1] The jurisdictional limitation on our review of removal orders based on criminal grounds (8 U.S.C. § 1252(a)(2)(C)), does not apply to review of CAT claims. *See Nasrallah*, 140 S. Ct. at 1689–92.

8 C.F.R. § 1208.18(a)(7)[2]; *Khouzam v. Ashcroft*, 361 F.3d 161, 171 (2d Cir. 2004) ("[T]orture requires only that government officials know of or remain willfully blind to an act and thereafter breach their legal responsibility to prevent it."); *see also Quintanilla-Mejia*, 3 F.4th at 592 (same in substance). When a petitioner alleges a fear of gang violence if removed, the BIA, in considering the state-action element, must consider whether it is more likely than not that "any public official, or any other person, including low-level local police officers, when acting under color of law, will participate or acquiesce in harm that the gang is likely to inflict and that is recognized as torture." *Garcia-Aranda v. Garland*, 53 F.4th 752, 761 (2d Cir. 2022). Evidence of some government efforts to prevent violence neither precludes nor compels a finding of acquiescence; "[r]ather, it invites careful factfinding." *Quintanilla-Mejia*, 3 F.4th at 593.

The agency first concluded that Blake testified credibly and had demonstrated it was more likely than not that he would be tortured by gang

---

[2] It is not clear from the record what version of the relevant regulations was applied by the agency. Certified Administrative Record ("CAR") at 3–5, 144, 147, 149. The current version, which went into effect on January 11, 2021—before the agency's decisions in this case—provides a more extensive definition of acquiescence than did the earlier version. On remand, the agency should identify the version it chooses to apply and state the legal authority for its choice.

members in Jamaica because of his assistance to law enforcement in the United States. It then denied relief, however, determining that he failed to establish that Jamaican authorities would consent or acquiesce to his torture. We now remand for two reasons: first, because the agency erred in requiring evidence that a specific official would be complicit or would acquiesce to Blake's torture, and second, because the agency did not sufficiently explain why evidence of *some* government efforts to combat gang violence reasonably allowed the agency to discount so completely Blake's evidence that Jamaican authorities would be unwilling to help someone in Blake's situation and may even participate in violence against him on behalf of gangs.

As to the first error, the IJ distinguished Blake's situation from that presented in *De La Rosa v. Garland*, 598 F.3d 103 (2d Cir. 2010), as follows: "In *De La Rosa*, the individual who was looking to kill the respondent had a brother who was a government official in the Dominican Republic and was able to recognize the respondent." CAR at 148 (IJ Dec.). The IJ then faulted Blake for failing to submit evidence demonstrating that "*specific* government officials in Jamaica . . . would consent or acquiesce[] in [his] torture." *Id.* (emphasis added). The BIA's statements reinforce this reading of the agency's position. It wrote that Blake

5

had "not provided sufficient evidence to establish that it is more likely than not that he would be singled out for torture by or with the consent or acquiescence . . . of a public official." *Id.* at 4 (BIA Dec.). Indeed, the BIA explicitly distinguished Blake's case from *De La Rosa* in similar fashion: it wrote, "Here, unlike in *De La Rosa*, the respondent has not provided any specific evidence that any public official is or would be complicit in any potential harm." *Id.* at 5.

Properly read, however, *De La Rosa* does not mandate evidence of acquiescence by a specific official. In *De La Rosa*, the agency found that the petitioner's likely attacker had contacts in the Dominican government, that the government and police suffered widespread corruption and infiltration by criminals, and that the government lacked the resources to prevent his murder. *See* 598 F.3d at 109–10. "Despite this array of factual findings," we wrote on review, the agency concluded that, because some government officials had made efforts to prevent his torture, De La Rosa failed to show that the Dominican government would acquiesce in his torture. *Id.* at 110. We therefore remanded to allow the BIA to address further whether "a government may [be found to] acquiesce to a person's torture where (1) *some* officials attempt to prevent that torture (2) while other officials are complicit, and (3) the government is

6

admittedly unable to actually prevent the torture from taking place." *Id.* at 110–11 (emphasis added). Thus, our decision to remand did not turn on the fact that De La Rosa had identified a specific official who would be complicit; we merely noted that as one factor tending to establish potential government acquiescence in that case. *See id.* at 109–10. In sum, evidence of targeting by a specific official is not required to find the government acquiescence necessary to obtain CAT relief; rather, the question is whether acquiescence of any official is more likely than not.

Our more recent decision in *Garcia-Aranda* further explicates this requirement. In *Garcia-Aranda*, a Honduran citizen sought relief under CAT on the theory that, if she were removed to Honduras, the Mara 18 gang would likely subject her to harm cognizable as torture, and Honduran authorities would acquiesce or consent to such torture. 53 F.4th at 760. The record reflected that on one occasion in the past, Garcia-Aranda and her family had been kidnapped and held captive by the Mara 18 gang, and that a local police officer participated in some capacity in the kidnapping. *Id.* at 755. The agency denied relief, "fault[ing] Garcia-Aranda for failing to show . . . that '*the police officer in question or any Honduran official* has an interest in torturing [her] at this time.'" *Id.* at 760

7

(quoting the BIA decision) (emphasis by the *Garcia-Aranda* Court). We reversed, observing that the BIA had "fatally erred" in adopting such a standard. *Id.* We held that the relevant analysis was "whether it is likely that *the Mara 18 gang* has an interest in torturing Garcia-Aranda at this time and whether it is likely that *any member of the local police who is acting under color of law* will participate in, or acquiesce in, that conduct." *Id.* at 760–61 (emphasis in original).

The agency's second error was its failure to sufficiently explain why, in its view, evidence of *some* government efforts to combat gang violence so completely outweighed Blake's country conditions evidence that Jamaican authorities would not help someone in Blake's situation, and his evidence that they may even participate in the violence against him. In arguing that substantial evidence supports the agency's conclusions, the Government relies on *Quintanilla-Mejia*. In *Quintanilla-Mejia*, we held that the record evidence "supports the agency's finding that [a] government is aggressively trying to combat gang violence, even through armed confrontations," and accordingly, we could not conclude "that the agency was compelled to find it likely that . . . [a] country's officials would acquiesce in [the petitioner's] torture by gang members." 3 F.4th at 593. As noted above, however, we also cautioned that such

evidence neither compels nor precludes a finding of acquiescence; "[r]ather, it invites careful factfinding." 3 F.4th at 593.

We identify critical differences between Blake's situation and that before the court in *Quintanilla-Mejia*. There, the petitioner alleged past attempts on his life but "offered no evidence to show that [government] officials were aware of past gang attacks on his life." *Id.* Further, the record reflected that government officials "would not turn a blind eye to harm of the respondent by gang members." *Id.* at 592. Blake, in contrast, presented expert testimony that it "would be foolhardy" for him to seek protection from the Jamaican police because it would put his life at further risk; Blake's expert testified that Jamaican police would interview him upon his return to the country, and that they would be less likely to assist him given his criminal record in the United States. In addition, the record showed that Blake's father unsuccessfully tried to report an incident in which a man pushed him off a bicycle and stole his necklace, the man claiming to do so because Blake was an informant. CAR at 196, 215–16. The agency here failed to explain how its acquiescence analysis took due account of these parts of the record. *See Scarlett v. Barr*, 957 F.3d 316, 336 (2d Cir. 2020) (remanding when the agency failed to give "reasoned consideration to all

relevant evidence and all principles of law applicable to determining government acquiescence in . . . torture").

Notwithstanding Blake's evidence of troubling country conditions, the agency discounted this showing in favor of evidence that "the Jamaican government is making an effort to combat gang violence and police corruption." CAR at 4. Regarding that effort, the IJ noted that Jamaica's Independent Commission of Investigations ("INDECOM") had investigated police abuses; Jamaican law enforcement had received training from the United States and other countries; the Jamaican government had intensified efforts to disrupt drug shipments; and law enforcement had increased identification, apprehension, and prosecution of gang members. The IJ's observations, however, were not accompanied by any data reflecting the effectiveness of these efforts: to the contrary, data in the record reflected an increase in murders, shootings, and numbers of gangs from 2018 to 2019—the years leading up to these INDECOM statements. CAR at 267–68, 272.

As the agency acknowledged, the record also established that some Jamaican law enforcement officers are linked to gangs; some officers participate in gang killings; the Jamaican police generally do not protect criminal deportees

from gang-affiliated killers; gangs commit crimes openly and with impunity in Jamaica; government corruption and accountability is a serious problem in Jamaica; and only five to eight percent of murders in Jamaica result in a conviction. In a similar vein, the State Department Report on which the IJ relied advised that "INDECOM remained one of the few external and independent oversight commissions that monitored security forces, but reported it was unable to investigate each case thoroughly due to manpower limitations and significant delays by police." U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., Jamaica 2020 Human Rights Report 3 (2021).[3] The State Department further reported that "[t]he government did not take sufficient action to address abuse and unlawful killings by security forces"; it "has mechanisms to investigate and punish abuse, but they were not always employed"; and "[f]ewer than 10 percent of the investigations of abuse resulted in recommendations for disciplinary action or criminal charges." *Id.*

In sum, the IJ failed adequately to explain how some evidence suggesting increased efforts by some government actors to combat gang violence and police

---

[3] Available at https://www.state.gov/wp-content/uploads/2021/03/JAMAICA-2020-HUMAN-RIGHTS-REPORT.pdf.

corruption "overr[ode] both the complicity of other government actors and the general corruption and ineffectiveness of the [Jamaican] government in preventing unlawful killings." *De La Rosa*, 598 F.3d at 110.

For the foregoing reasons, the petition for review is GRANTED, the BIA's decision is VACATED, and the case is REMANDED for further proceedings consistent with this order. All pending motions and applications are DENIED and stays VACATED.

<div style="margin-left: 50%">
FOR THE COURT:<br>
Catherine O'Hagan Wolfe,<br>
Clerk of Court
</div>